Christopher A. Lynch
Benjamin R. Fliegel
REED SMITH LLP
599 Lexington Ave, 22nd Floor
New York, New York 10022
Telephone: (212) 521-5400
Facsimile: (212) 521-5450
E-mail:  CLynch@reedsmith.com
             BFliegel@reedsmith.com

*Special Counsel to Howard M. Ehrenberg, as liquidating Trustee of the jointly administered bankruptcy estates of Orion HealthCorp, Inc. and Constellation Healthcare Technologies, Inc.*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| ORION HEALTHCORP, INC.[1] | Case No. 18-71748 (AST) |
| Debtors. | (Jointly Administered) |
| Howard M. Ehrenberg, as liquidating Trustee of the jointly administered bankruptcy estates of Orion HealthCorp, Inc. and Constellation Healthcare Technologies, Inc., | Adv. Pro. No. _____ |
| Plaintiff, | |
| - v. - | |
| John Johnston, David Andrew Clark, Moshe "Mark" Menachem Feuer, Sir Rodney Malcolm Aldridge, Shawn H. Zimberg, Joseph A. Seale, Truc To, John Esposito, Mark Bellisimo, Cliona Sotiropoulos, Arvind Walia, Dale Brinkman, Melodie Kraljev, and Alon P. Baram, | |
| Defendants. | |

---------------------------------------------------------------x

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Orion Healthcorp, Inc. (7246); Constellation Healthcare Technologies, Inc. (0135); NEMS Acquisition, LLC (7378); Northeast Medical Solutions, LLC (2703); NEMS West Virginia, LLC (unknown); Physicians Practice Plus Holdings, LLC (6100); Physicians Practice Plus, LLC (4122); Medical Billing Services, Inc. (2971); Rand Medical Billing, Inc. (7887); RMI Physician Services Corporation (7239); Western Skies Practice Management, Inc. (1904); Integrated Physician Solutions, Inc. (0543); NYNM Acquisition, LLC (unknown) Northstar FHA, LLC (unknown); Northstar First Health, LLC (unknown); Vachette Business Services, Ltd. (4672); Phoenix Health, LLC (0856); MDRX Medical Billing, LLC (5410); VEGA Medical Professionals, LLC (1055); Allegiance Consulting

## ADVERSARY PROCEEDING COMPLAINT

Plaintiff, Howard M. Ehrenberg, liquidating trustee ("Plaintiff" or "Trustee") of the jointly administered bankruptcy estates of Orion HealthCorp, Inc. ("Orion") and Constellation Healthcare Technologies, Inc. ("CHT," and together with Orion, the "Debtors"), by and through his attorneys, alleges as follows:

## NATURE OF THE ACTION

1. Debtors are the victims of negligent mismanagement as well as gross lack of oversight by Defendants (defined below), Debtors' former directors and officers, who caused Debtors to assume liabilities for which they had no ability to pay and thereby forced Debtors into the subject bankruptcy. The Trustee brings this adversary proceeding against the Defendants to recover damages caused by the breach of Defendants' legal obligations and fiduciary duties of care, loyalty and candor to Debtors, their shareholders, and their creditors.

2. Each of the Defendants breached their duties by failing to take the reasonable care that a reasonable director or officer would be expected to take to protect the assets of the Debtors, to prevent harm to the Debtors, and to avoid incurring unreasonable liabilities for which they knew, or should have known, the Debtors would be unable to pay.

3. *First*, each of the Defendants knew or should have known that Parmjit "Paul" Parmar ("Parmar"), then Chief Executive Officer and Chairman of the Board of Directors of the Debtors, conducted a number of transactions that removed substantial assets from the Debtors for his own personal profit and to the detriment of the Debtors. The directors and officers at that time failed to initiate or implement any diligence or audits of these transactions, or implement any fraud protection practice, which would have uncovered Parmar's looting of the Debtors' assets. Although these transactions created a number of red flags that a reasonable director or officer would have investigated, the Defendants took no action to investigate, document, or prevent these transactions. For purposes of this complaint, the above-described acts undertaken by Parmar and his co-conspirators are collectively referred to herein as the "Parmar Conspiracy."

---

Associates, LLC (7291); Allegiance Billing & Consulting, LLC (7141); New York Network Management, LLC (7168). The corporate headquarters and the mailing address for the debtors listed above is 1715 Route 35 North, Suite 303, Middletown, NJ 07748.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

4. ***Second***, each of the Defendants allowed a "go-private" merger transaction to become effective on January 30, 2017, which transaction had the reasonable and foreseeable effect that the Debtors would incur liabilities for which they could not pay. Each of the Defendants had access to financial information showing that the Debtors would not be able to pay the liabilities incurred as part of the merger transaction, and nonetheless allowed the merger to go forward. Each of the Defendants knew, or should have known, that the merger would result in the insolvency of the Debtors but failed to object, investigate, or otherwise take reasonable care to prioritize the interests of the Debtors, their shareholders, and their creditors.

## THE PARTIES

### *A.    The Trustee*

5. Plaintiff Howard M. Ehrenberg is the duly appointed liquidating Trustee for the Debtors' bankruptcy estates.

6. On March 16, 2018, the Debtors each filed a voluntary petition under Chapter 11 of Title 11 of the United States Code. On May 15, 2018, the Debtors filed their Schedules and Statement of Financial Affairs. *See* Case No. 8-18-71748 (Dkt. Nos. 203, 204); Case No. 8-18-71749 (Dkt. Nos. 12, 13).

### *B.    The Directors*

7. Upon information and belief, John Johnston ("Johnston") is a resident of the United Kingdom. At all relevant times herein, Johnson was a member of Debtors' Board of Directors.

8. Upon information and belief, David Andrew Clark ("Clark") is a resident of the United Kingdom. At all relevant times herein, Clark was a member of Debtors' Board of Directors.

9. Upon information and belief, Moshe (Mark) Menachem Feuer ("Feuer") is a resident of the State of New York. At all relevant times herein, Feuer was a member of Debtors' Board of Directors. Upon information and belief, on or about February 3, 2017, Feuer received a fraudulent transfer of $900,000.00 from Debtors at the direction of Zaharis (defined below).

10. Upon information and belief, Sir Rodney Malcolm Aldridge ("Aldridge") is a resident of the United Kingdom. At all relevant times herein, Aldridge was a member of Debtors' Board of Directors.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

11. Upon information and belief, Dr. Shawn H. Zimberg, M.D. ("Zimberg") is a radiation oncologist licensed to practice in, and is a resident of, the State of New York. At all relevant times herein, Zimberg was a member of Debtors' Board of Directors.

12. For the purposes of this complaint, Johnston, Clark, Feuer, Aldridge, and Zimberg are collectively referred to herein as the "Directors."

### C. The Officers

13. Upon information and belief, Joseph A. Seale ("Seale") is a resident of the State of Texas. At all relevant times herein, Seale was an officer of Debtors and acted as President of Orion.

14. Upon information and belief, Truc To ("To") is a resident of the State of New Jersey and was formerly a partner at KPMG. While at KPMG, To oversaw the due diligence of the "go-private" merger. In or about April 2017, after the Merger (defined below) closed, To became the Chief Financial Officer of CHT. He held this position until May 2018.

15. Upon information and belief, John Esposito ("Esposito") is a resident of the State of New York. At all relevant times herein, Esposito was an officer of Debtors.

16. Upon information and belief, Mark Bellisimo ("Bellisimo") is a resident of the State of New York. At all relevant times herein, Bellisimo was an officer of Debtors.

17. Upon information and belief, Cliona Sotiropoulos ("Sotiropoulos") is a resident of the State of New Jersey. At all relevant times herein, Sotiropoulos was an officer of Debtors.

18. Upon information and belief, Arvind Walia ("Walia") is a resident of the State of New York. At all relevant times herein, Walia was an officer of Debtors and was formerly the Chief Executive Officer of Orion prior to July 31, 2018.

19. Upon information and belief, Dale Brinkman ("Brinkman") is a resident of the State of Colorado. At all relevant times herein, Brinkman was an officer of Debtors.

20. Upon information and belief, Melodie Kraljev ("Kraljev") is a resident of the State of New York. At all relevant times herein, Kraljev was an officer of Debtors.

21. Upon information and belief, Alon P. Baram ("Baram") is a resident of the State of New York. At all relevant times herein, Baram was an officer of Debtors.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

22.     For the purposes of this complaint, Seale, To, Esposito, Bellisimo, Sotiropoulos, Walia, Brinkman, Kraljev, and Bram are collectively referred to herein as the "Officers" and, together with the Directors, the "Defendants."

### JURISDICTION AND VENUE

23.     This action is a civil proceeding related to a case under Title 11 of the United States Code and pursuant to Federal Rule of Bankruptcy Procedure 7001. This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334(b). This is a core proceeding under 28 U.S.C. § 157(b)(2).

24.     Venue is proper in this Court, including venue pursuant to 28 U.S.C. § 1409, because, among other things, this is the district in which the Debtors' bankruptcy action is pending. Pursuant to 28 U.S.C. § 1391, venue is also appropriate as Defendants were authorized to and regularly carried out substantial business in this district and the acts and conduct complained of herein took place within this district. Accordingly, this Court also has personal jurisdiction over the Defendants.

25.     In the event that this Bankruptcy Court or any other court of competent jurisdiction determines any part of this adversary proceeding to be "non-core," Plaintiff consents to the entry of final orders and judgments by the Bankruptcy Court, pursuant to Federal Rule of Bankruptcy Procedure 7008. Plaintiff also consents to the entry of final orders or judgments by the Bankruptcy Court if it is determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

### STATEMENT OF FACTS COMMON TO ALL CLAIMS FOR RELIEF

#### A.     *The Debtors' Corporate Background*

26.     In 1984, Orion was incorporated in Delaware under the name Technical Coatings Incorporated. In 2004, after undergoing a series of name changes, this company changed its name to Orion HealthCorp, Inc. Orion thereafter acquired multiple operating subsidiaries.

27.     On September 3, 2014, CHT was formed to become the holding company for Orion and its subsidiaries.

28.     At this time, Parmar was the Chief Executive Officer of CHT, Sotiros "Sam" Zaharis ("Zaharis") was the Chief Financial Officer, and Ravi Chivukula ("Chivukula") was the Controller of

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

CHT and served on its board of directors. For purposes of this complaint, Parmar, Zaharis and Chivukula are collectively referred to as the "Parmar Conspirators".

29.     CHT was formed to create a publicly traded entity on London Stock Exchange's Alternative Investments Market ("AIM"). According to the AIM Offering Memorandum, CHT was to acquire all of the issued share capital of Orion immediately prior to CHT's admission to trading on AIM. CHT went public on December 8, 2014.

### B. *The Parmar Conspirators Attempt to Steal CHT Assets*

30.     Over the course of several years, the Parmar Conspirators cooperated and conspired to fabricate the acquisition of multiple fictitious companies, from which the Parmar Conspirators would obtain the majority of the sales proceeds. The Parmar Conspirators represented that these fictitious companies were operating businesses with bona fide customers and revenue when, in fact, they had no business operations, employees, customers, or revenue, and that they would personally receive the value that CHT paid to acquire these fictitious companies.

31.     The acquisitions made as part of the Parmar Conspiracy shared common characteristics: (1) money was raised through secondary public offerings on the AIM; (2) the acquisition target was formed shortly before the date of acquisition; and (3) the proceeds of the public offerings were used for other purposes, including but not limited to, the creation of fictitious customer receipts and as revenue for other CHT business units.

32.     The Parmar Conspiracy includes, but is not limited to, the following acquisitions:

   a. **Northstar First Health LLC ("Northstar")**: Northstar was formed on June 12, 2015 and sold to CHT via a synthetic entity, Northstar FHA, LLC, that had been formed on August 24, 2015. Neither Northstar nor Northstar FHA, LLC had independent operations at the time Northstar was acquired by CHT. Instead, immediately before CHT acquired Northstar, Northstar acquired Vachette Business Services, LTD for $2.785 million, which represented the entirety of Northstar's assets. On September 16, 2015, CHT announced its acquisition of Northstar for $18 million.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

    b. **Phoenix Health LLC ("Phoenix")**: On September 18, 2015, two days after the announcement of the Northstar purchase, CHT announced its acquisition of Phoenix. Phoenix had no operations at the time of the alleged acquisition and did not have an Employer Identification Number ("EIN") until November 27, 2015. Nevertheless, in its purchase announcement, CHT described Phoenix as having 138 employees and generating revenue of $9.8 million and EBITDA of $2.2 million, with net assets of $1.1 million.

    c. **MDRX Medical Billing LLC ("MDRX")**: On December 7, 2015, MDRX was formed in Delaware on December 7, 2015, and four days later, on December 11, 2015, CHT announced a second capital raise earmarked for the acquisition of MDRX. MDRX had no operations, employees, or EIN number at the time, but claimed to have acquired its customers from a different fictitious company, Apex Healthcare Systems. In order to effect the capital raise to purchase MDRX, the Directors and other board members approved the admission of 18,751,195 new shares to the AIM market. On February 10, 2016, CHT announced its acquisition of MDRX for $28 million.

33. The Parmar Conspirators also diverted CHT shares, and other interests representing the CHT shares, to Parmar and other members actively involved in the Parmar Conspiracy, through a series of corporate transactions by and among a complex labyrinth of Delaware limited liability companies that Parmar caused to be formed and/or controlled.

34. The Parmar Conspiracy includes, but is not limited to, the following transactions:

    a. A transfer of an interest in CHT shares to Naya, a Delaware limited liability company wholly owned and controlled by Parmar.

    b. A transfer of an interest in CHT shares to Alpha Cepheus, LLC a Delaware limited liability company wholly owned and controlled by Parmar, and to CHT Holdco, LLC, ("CHT HoldCo") another Delaware limited liability company in which he holds a substantial interest.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

  c. Causing Naya to transfer the interests it received in the first transaction to an unknown party for an unknown price.

35. The Parmar Conspiracy caused CHT's revenue and earnings to be overstated in its financial statements filed with the AIM in 2015 and 2016. CHT's stock price then increased based on these inaccurate financial statements.

36. Furthermore, Parmar had a list of outstanding judgments obtained against him in connection with his prior business dealings. He also had an extensive litigation history, has been sanctioned for filing and perpetuating vexatious litigation, and was subject to both civil and criminal litigation related to his operation of CHT. Despite this, Parmar and the Parmar Conspirators were allowed to run CHT unchecked by the Defendants for multiple years.

### C. *The Defendants Took No Reasonable Steps to Prevent or Investigate the Acquisitions and Transaction in the Parmar Conspiracy*

37. As directors and officers, the Defendants were obligated to operate Debtors with reasonable care, loyalty and candor. The Defendants failed to take any reasonable steps to investigate, prevent, or otherwise protect the Debtors from the sham acquisitions and transactions in the Parmar Conspiracy.

38. Any reasonable investigation of the acquisitions or transactions in the Parmar Conspiracy would have revealed that the fictitious entities acquired by CHT had no value, or were acquired for an amount that far exceeded their value.

39. Any reasonable investigation of the acquisitions or transactions in the Parmar Conspiracy would have revealed that the information about the fictitious companies provided by the Parmar Conspirators was false and/or misrepresentative.

40. The Directors and Officers knew, or should have known, that there were significant red flags in the acquisitions or transactions in the Parmar Conspiracy, and failed to take any steps investigate, prevent, or otherwise protect the Debtors from the sham the acquisitions and transactions in the Parmar Conspiracy.

41. The Directors and Officers had sufficient information that would put them on notice of the potential for Parmar to engage in sham or misrepresentative corporate transactions. For example:

a. On December 27, 2016, the Destra Trust, CH Group and CHLLC commenced an *in personam* action styled *Destra Targeted Income Unit Investment Trust, on behalf of Unitholders, et al. v. Parmjit Singh Parmar (a.k.a. Paul Parmar), et al.*, Del. Ch. No. 13006-VCL (the "Destra Litigation") before the Chancery Court, by filing a verified complaint (1) seeking a declaratory judgment as to the ownership of certain CHT shares and invalidating certain transfers of CHT shares and any actions taken by Parmar and the other defendants in the Destra Litigation regarding the conveyance, transfer, or encumbrance of CHT's shares; (2) asserting breaches of fiduciary duties and the aiding and abetting thereof; (3) asserting breaches of the CH Group and CHT operating agreements; and (4) asserting counts of fraudulent transfer, conversion, unjust enrichment, and civil conspiracy and fraud.

b. The Destra Litigation arises from a "go-public transaction" involving Debtors and others including Southport Lane Management, in which the plaintiffs alleged that Southport defrauded its investors, most or all of whom were insurance companies, siphoning off good, high-quality assets, including cash, and exchanging them with "dubious investments" including seven "synthetic preferred investments", including the CHT go-public transaction.

c. Ultimately, by order dated January 25, 2017, the Chancery Court directed entities to deposit certain escrowed funds, representing a $55,267,485.28 portion of the shareholder redemption payments that were expected to be paid to Parmar-controlled entities in an escrow account maintained at Wilmington Savings Fund Society under the name Blue Mountain Healthcare/Young Conaway Stargatt & Taylor Escrow Savings (the "Escrowed Funds").

d. In or about December 2017, the FBI obtained a seizure warrant involving the Escrowed Funds.

e. Thereafter, on March 16, 2018, the Delaware Chancery Court granted a motion to lift the preliminary injunction as to the Escrowed Funds to allow the seizure of the Escrowed Funds pursuant to the warrant, and to pay the administrative expenses

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

from the Escrow Agent. The Debtors and non-party Debtors sought recovery of these funds.

 f. The allegations pled in the Destra Litigation were communicated to the Directors and Officers and should have put them on notice that the Parmar Conspirators was engaged in a series of suspect and potentially fraudulent transactions. The seriousness of these allegations called into question the legitimacy of transactions presented by the Parmar Conspirators and warranted a complete investigation by the Directors and Officers, or other care to protect the shareholders, interests, and assets of CHT.

42. Furthermore, the Directors had notice that Parmar was frequently a party to business disputes and allegations of misrepresentations, not limited to the Destra Litigation, which pre-dated the more egregious acts of the Parmar Conspiracy. Court records from actions brought throughout the United States indicate a pattern by Parmar of disputed business transactions, of refusing to pay amounts due until lawsuits are initiated and judgments obtained against him, and seeking to negotiate judgment amounts down after the fact. Parmar has been sanctioned for filing baseless allegations, and has abused the litigation process by using court proceedings to intimidate opponents and delay paying his obligations. Parmar's record of extensive heated litigation matters bears this out:

 a. In a California action relating to Parmar's acquisition of CHT, a federal court granted summary judgment to a CHT employee for CHT's refusal to pay amounts due him; the court sent other claims and the issue of punitive damages to trial. *See Mathews v. Orion HealthCorp, Inc.*, No. C-13-04378, 2014 WL 4245986 (N.D. Cal. 2014).

 b. In an action in Kansas by a finance company brought against Parmar on a personal guarantee for a total of $13,032,500, a federal court noted that Parmar had "effectively controverted" only 1 out of 42 paragraphs of material facts asserted against him, and granted summary judgment against him on the claimed debt. *Cessna Fin. Corp. v. VYWB, LLC & Parmjit S. Parmar*, No. 13-1311, 2014 WL 5325782, at *1 (D. Kan. 2014); *see also Oberon Sec., LLC v. Parmar*, Index

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

653654/2013 (N.Y. Sup. Ct. 2013) (suit over amounts claimed due from Parmar for investment banking fee and Parmar $32 million counterclaim for disparagement).

c. In a New Jersey action arising out of an asset purchase transaction involving Parmar affiliate MD Tablet, LLC, the trial court sanctioned Parmar for over $175,000 for vexatious bad faith litigation, noting "[t]his was a shakedown…of the defendants." *Grange Consulting Grp. v. Gangar*, No. A-1753-12T1, 2014 WL 3749145, at *4 (N.J. Super. Ct. App. Div. July 23, 2014).[2]

43. By allowing Parmar to enter into the sham acquisitions and transactions in the Parmar Conspiracy without conducting due and reasonable diligence into the nature and value of the fictitious entities in the Parmar Conspiracy, the Defendants abandoned their fiduciary duties.

44. The Defendants failed to institute any policies and procedures to investigate fraud, audit transactions, or otherwise prevent the Parmar Conspirators, or others, from entering CHT into the sham acquisitions and transactions in the Parmar Conspiracy.

45. As the above demonstrates, Parmar had a well-established record of duplicity and corporate misconduct that pre-dated his control of Debtors and which continued unfettered thereafter. In light of this history, which was either known or readily available to the Directors, the Directors should not have allowed Parmar and the other members of the Parmar Conspiracy to wield unmitigated and unchecked control over Debtors.

### D. *The Defendants Breached Their Fiduciary Duties When the Go-Private Merger Became Effective*

46. Effective as of January 30, 2017, CHT entered into a go-private merger transaction with CC Capital Management LLC ("CC Capital"). This transaction is generally referred to herein as the "Merger."

47. As inducement to enter into the Merger, Parmar represented and warranted that CHT's financial statements were truthful and accurate, that there were no false entries on any of CHT's books

---

[2] Parmar was engaged in litigation related to the above business transaction in at least three separate jurisdictions and states. In one of the suits, he added claims against his adversary's lawyer. *Grange Consulting Grp. v. Bergstein*, 13-cv-06768-PSG-LHG (D.N.J. Nov. 6, 2013). This dispute included frivolous litigation claims against a former employee, which the court found were commenced, used, or continued in bad faith solely for the purpose of harassment, delay or malicious injury, and having no reasonable, legal or equitable basis.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

and records, that CHT's accounts receivable were the result of bona fide transactions, and that its material contracts were valid and enforceable. Upon information and belief, these representations and warranties were known by Parmar to be false when made.

48. Additionally, Parmar and Alpha Cepheus, LLC, First United Healthcare, LLC, and Constellation Health, LLC, entities under Parmar's control, falsely represented and warranted that CHT's representations and warranties were true and correct.

49. In order to meet its obligations under the Merger, Orion obtained Merger financing to fund shareholder redemption payments.

50. As collateral, Debtors granted first priority liens on all of their property, including 100% of the equity interests in each of their subsidiaries,to the financial institution providing the Merger financing.

51. To fund the shareholder redemption payments, (i) CC Capital conveyed a capital contribution to CHT HoldCo; (ii) Debtors and non-party debtors incurred liens on all their assets to secure the Merger financing; and (iii) CHT issued unsecured promissory notes to its shareholders in the amount of approximately $39.6 million.

52. As collateral security for their guarantees, Debtors and non-party debtors granted first priority liens on all of their property, including 100% of the equity interests in each of their subsidiaries, to the financial institution providing the Merger financing.

53. The Merger financing was jointly and severally guaranteed by Debtors and non-party debtors.

54. The remainder of the acquisition price was financed by the issuance by CHT of unsecured promissory notes to its shareholders in the amount of approximately $39.6 million.

55. On January 18, 2017, CHT submitted the Merger for approval to its shareholders, which was granted.

56. On January 26, 2017, CHT requested that trading of its shares on the AIM be suspended.

57. The Merger closed on or about January 30, 2017.

58. Upon information and belief, on or about January 30, 2017, in connection with the funding of the Merger, $7,843,621.72 was wired into an account in the name of, or for the benefit of AAKB Investments Ltd. As the beneficial owner of AAKB Investments Ltd., Pavan Bakhshi, a director of Debtors who is believed to be involved in the Parmar Conspiracy, received, or otherwise directly benefited from, these monies paid in connection with the Merger.

59. Prior to the Merger, Parmar and certain Parmar-controlled entities owned approximately 53.5% of CHT's 92,081,632 outstanding shares. The remaining shares were publicly held. Following the Merger, (i) CHT HoldCo, a special purpose entity, owned 100% of the equity interests in CHT; (ii) CC Capital CHT HoldCo, LLC ("CC HoldCo"), a separate special purpose entity, controlled approximately 50.7% of the economic and 55% of the voting interests in CHT; and (iii) Alpha Cepheus, LLC controlled approximately 49.3% of the economic and 45% of the voting interests in CHT.

60. The Parmar Conspirators flagrantly falsified the true financial condition of the Debtors and concealed this from CHT's creditors pre- and post-Merger.

61. The Debtors were under no obligation to enter into the Merger or incur the obligations under the Merger financing that resulted in a massive payout to its Shareholders. Had the Directors and Officers undertaken adequate due diligence at any point prior to the Merger, the Debtors would not have entered into the Merger.

62. Upon the closing of the Merger, CHT's Board was reconstituted, with CC HoldCo appointing the majority of directors. Parmar continued as a Director.

63. In or about April 2017, Director To, the KPMG partner who had led the financial due diligence efforts in connection with the Merger, was hired as Chief Financial Officer of CHT.

64. To was part of an effort by the newly constituted Board to improve CHT's financial and accounting processes and reporting and to exercise increased oversight over the processes. With access to this information, questions and concerns emerged about the state of CHT's business operations.

65. Upon information and belief, in or about September 2017, Parmar complained to To about the increased oversight.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

66. On September 14, 2017, Parmar resigned as CEO of CHT and its subsidiaries.

67. The emerging questions and concerns were addressed with Parmar, who, upon information and belief, provided various explanations. Upon information and belief, these conversations culminated in a specially called meeting of CHT's board of directors on or about September 29, 2017 wherein Parmar disclosed that CHT's consolidated revenue and earnings before interest, tax, depreciation and amortization ("EBITDA") for 2017 were $70 million less and $50 million less, respectively, than the amounts indicated during the Merger negotiations.

68. On September 29, 2017, Parmar resigned from the board of directors of CHT effective immediately.

69. The Directors and Officers mismanagement of the Debtors, their accounts, and their interests, and their willingness to accept greater and greater debt without truly investigating Debtors' ability to pay these liabilities, is not consistent with the general standards of care that a person in the Directors' and Officers' position owes to a company, its shareholders, and its creditors.

## FIRST CLAIM FOR RELIEF

## BREACH OF FIDUCIARY DUTIES ARISING OUT OF THE PARMAR CONSPIRACY

70. The Trustee repeats and re-alleges each and every allegation contained in paragraphs 1 through 69 above as if fully set forth herein.

71. By virtue of their position, as well as their management and control over the Debtors, the Directors and Officers owed fiduciary duties to each and both of the Debtors. In addition, each of the Directors and Officers owed a fiduciary duty to Debtors' investors, and when Debtors became insolvent, to Debtors' creditors.

72. The duties owed by Directors and Officers to the Debtors included, but are not limited to, the duty of good faith and fidelity, the duty of loyalty, the duty of care, the duty of candor and the duty to act competently.

73. As part of the duty to act competently, each of the Directors and Officers had the duty to operate the Debtors with reasonable care, including running the Debtors with reasonable diligence, hiring personnel and entities with appropriate experience in matters of business and finance, acting to

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

prevent fraud and mismanagement, and conducting reasonable diligence into corporate acquisitions and transactions in which Debtors incurred large debts and liabilities.

74. Acting in their capacity as Directors and Officers, each of the Defendants breached the fiduciary duties owed to Debtors, Debtors' investors, and Debtors' creditors, by, among other things:

    a. Allowing Parmar to operate as CEO of Debtors despite information signaling his unfitness for the position, and the potential for fraudulent transactions;

    b. Failing to investigate the acquisitions and transactions involved the Parmar Conspiracy; and

    c. Failing to investigate the allegations contained in the Destra Litigation.

75. The Directors' and Officers' conduct as set forth above was in direct conflict with the interests of Debtors, and their actions were taken without a viable business reason.

76. The Directors' and Officers' breaches of their fiduciary duties were a direct and proximate cause of, and a substantial factor in, Debtors' ultimate financial downfall and the resulting bankruptcies in that the numerous red flags associated with the operation of Debtors, including, but not limited to, the Destra Litigation, contributed to Debtors' inability to pay its liabilities. The Directors and Officers permitted the Parmar Conspirators to enter into the acquisitions and transactions in the Parmar Conspiracy and operate Debtors in a manner that incurred debt and obligations rather than stopping operations, and failed to replace the Parmar Conspirators with competent and independent management, or take such other action which would have resulted in the ability of Debtors to amend and modify their business practices in an open and appropriate fashion and in conformance with state and federal laws, rules and regulations.

77. The Directors' and Officers' conduct as set forth above was a direct and proximate cause of, and a substantial factor in, Debtors being damaged in a sum not less than $10 million, the exact amount of which will be determined by proof at trial.

## SECOND CLAIM FOR RELIEF

## BREACH OF FIDUCIARY DUTIES ARISING OUT OF THE GO-PRIVATE MERGER

78. The Trustee repeats and re-alleges each and every allegation contained in paragraphs 1 through 77 above as if fully set forth herein.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

79. By virtue of their position, as well as their management and control over the Debtors, the Directors and Officers owed fiduciary duties to each and both of the Debtors. In addition, each of the Directors and Officers owed a fiduciary duty to Debtors' investors, and when Debtors became insolvent, to Debtors' creditors.

80. The duties owed by Directors and Officers to the Debtors included, but are not limited to, the duty of good faith and fidelity, the duty of loyalty, the duty of care, the duty of candor and the duty to act competently.

81. As part of the duty to act competently, each of the Directors and Officers had the duty to operate the Debtors with reasonable care, including running the Debtors with reasonable diligence, hiring personnel and entities with appropriate experience in matters of business and finance, acting to prevent fraud and mismanagement, and conducting reasonable diligence into corporate acquisitions and transactions in which Debtors incurred large debts and liabilities.

82. Acting in their capacity as Directors and Officers, each of the Directors and Officers breached the duties owed to Debtors, Debtors' investors, and Debtors' creditors, by allowing the Merger to become effective on January 30, 2017, which had the reasonable and foreseeable effect that CHT would incur liabilities for which it had the inability to pay. At the time of Merger, on January 30, 2017, each of the Directors and Officers had access to financial information showing that the liabilities incurred would not be able to be paid by CHT following the Merger. Despite having this information, the Directors and Officers still allowed it to go forward instead of conducting a necessary and reasonable investigation into the Debtors' ability to take on the liabilities, or alternatively insofar as an investigation was conducted, the Directors and Officers failed to act on the information collected.

83. Each of the Directors and Officers knew or should have known that the Merger would result in the insolvency of CHT and failed to object, investigate, or otherwise take reasonable care to prioritize the interests of CHT, its shareholders, and its creditors by or before January 30, 2017.

84. The Directors' and Officers' conduct as set forth above was in direct conflict with the interests of Debtors, and their actions were taken without a viable business reason.

85. The Directors' and Officers' breaches of their fiduciary duties to Debtors in the manner set forth above were a direct and proximate cause of, and a substantial factor in, Debtors' ultimate

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

financial downfall and the resulting bankruptcies in that the Merger left Debtors unable to pay their liabilities.

86. The Directors' and Officers' conduct as set forth above was a direct and proximate cause of, and a substantial factor in, Debtors being damaged in a sum not less than $10 million, the exact amount of which will be determined by proof at trial.

## THIRD CLAIM FOR RELIEF

## NEGLIGENCE

87. The Trustee repeats and re-alleges each and every allegation contained in paragraphs 1 through 86 above as if fully set forth herein.

88. Each of the Directors and Officers undertook actions or omissions that persons of ordinary prudence in the same or similar circumstances would not have done. Specifically, after ceasing to be Directors and Officers of the Debtors, each of the Directors and Officers failed to take any reasonable action to place the new officers and directors on notice of the myriad of red flags associated with Debtors' operations including, but not limited to, the Destra Litigation, the sham acquisitions and transactions in the Parmar Conspiracy, and Parmar's history of litigation and suspicious conduct.

89. Any reasonable person would have alerted Debtors' new and incoming officers and/or board of directors of the red flags and problems associated with Debtors' operations.

90. Instead, Directors and Officers failed to act and stayed silent, allowing the harm to Debtors to increase, and thereby breached their duty of reasonable care.

91. These acts and omissions caused and contributed to the Debtors' injuries by widening the Debtors' window of harm, which a reasonably prudent person in similar circumstances would have known to be a reasonable and foreseeable consequence.

92. The Directors' and Officers' conduct as set forth above was a direct and proximate cause of, and a substantial factor in, Debtors being damaged in a sum not less than $10 million, the exact amount of which will be determined by proof at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, the Trustee respectfully seeks the following relief:

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1.	With respect to the First Claim for Relief, the Trustee requests that the Court enter judgment against each of the Directors and Officers, jointly and severally, for actual money damages in an amount to be proven at trial, including compensatory damages, consequential damages, interest, punitive damages, and other such relief the Court deems just and proper.

2.	With respect to the Second Claim for Relief, the Trustee requests that the Court enter judgment against the Directors and Officers, jointly and severally, for actual money damages in an amount to be proven at trial, including compensatory damages, consequential damages, interest, and other such relief the Court deems just and proper.

3.	With respect to the Third Claim for Relief, the Trustee requests that the Court enter judgment against the Directors and Officers, jointly and severally, for actual money damages in an amount to be proven at trial, including compensatory damages, consequential damages, interest, and other such relief the Court deems just and proper.

### REQUEST FOR JURY TRIAL

The Trustee hereby requests trial by jury on all claims so triable. Pursuant to, and in accordance with 28 U.S.C. § 157(e), the Trustee consents to this Court conducting the jury trial.

Dated: March 13, 2020

Respectfully Submitted,

REED SMITH LLP

By: /s/ Christopher A. Lynch
　　Christopher A. Lynch
　　Benjamin R. Fliegel
　　599 Lexington Ave, 22nd Floor
　　New York, New York 10022
　　Telephone: (212) 521-5400
　　Facsimile: (212) 521-5450
　　E-mail:　CLynch@reedsmith.com
　　　　　　BFliegel@reedsmith.com

*Special Counsel to Howard M. Ehrenberg, as liquidating Trustee of the jointly administered bankruptcy estates of Orion HealthCorp, Inc. and Constellation Healthcare Technologies, Inc.*

REED SMITH LLP
A limited liability partnership formed in the State of Delaware